# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>      Plaintiff,<br><br>      v.<br><br>PUBLISHERS CLEARING HOUSE LLC,<br>a New York limited liability company,<br><br>      Defendant. | **Case No**:   **23-cv-4735**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or the "Commission"), for its Complaint alleges:

1.      Plaintiff brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, and Section 7(a) of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C. § 7706(a), which authorizes Plaintiff to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and the CAN-SPAM Act, 15 U.S.C. §§ 7701-7713.

## SUMMARY OF CASE

2.      Although Publishers Clearing House LLC ("PCH" or "the Company") is required to allow consumers to participate in its sweepstakes promotions without purchasing a product, PCH uses deceptive and manipulative statements and user interface designs (sometimes referred to as "dark patterns") to deceive consumers into believing that they must order products before they can enter a sweepstakes or that ordering products increases their odds of winning a

sweepstakes.

3.      PCH uses the prospect of winning lucrative sweepstakes prizes to lure consumers into repeatedly visiting its e-commerce website and buying products.

4.      PCH targets older and lower-income consumers:  the average age of PCH's "core consumer" on its e-commerce website is 66 years old and 54% of its "core consumers" earn less than $50,000.  According to the Census Bureau, the median household income in 2020 was $67,621.  PCH's own survey results show that 71% of its core e-commerce customers believe that "there is no such thing as free money."  PCH capitalizes on this fact by misleading them into believing that they must place an order to buy products to enter a sweepstakes or that ordering will increase their odds of winning.

5.      When consumers first navigate to the homepage on PCH.com, they are presented with an "Official Entry Form" or "Official Entry Registration Form."  PCH misrepresents that consumers who fill out this form and hit "Submit Entry!," "WIN IT!," or "Win for Life!" (the "call-to-action button") will be then entered into a sweepstakes.  PCH does not enter consumers into a sweepstakes when they enter their personal information and hit the call-to-action button.

6.      Instead of entering consumers into the sweepstakes after they have hit the call-to-action button, PCH takes them to its e-commerce site where consumers must click through several webpages of advertisements for products, including magazine subscriptions.  It is only after scrolling and clicking through several webpages of advertisements that consumers are presented with another call-to-action button where they can finally submit their sweepstakes entry.  After those consumers enter the sweepstakes, PCH subsequently sends them emails that falsely represent that they must complete another step to claim a prize number on the "winner

2

selection list" or be eligible to win the sweepstakes. Some emails misrepresent that if consumers do not act in response to the emails, they will be ineligible to win or disqualified from winning the sweepstakes.

7. However, the links in those emails do not send consumers to a true "final" or additional step of some kind, but direct consumers to PCH's e-commerce site where they must again navigate through a long series of PCH webpages containing advertisements for products. Throughout these marketing emails and webpages, PCH uses deceptive statements to mislead consumers into believing that purchasing a product is required to enter a sweepstakes or that purchasing a product will increase the odds of winning a sweepstakes prize. PCH also employs dark patterns throughout the consumer's experience by, among other things: linking and conflating "ordering" products and "entering" the sweepstakes through the use of trick wording and visual interference; placing disclosures in small and light font and in places where a consumer is unlikely to see them; bombarding consumers with emails that pressure them to take immediate action by clicking on the email or purportedly risk losing the opportunity to enter or win the sweepstakes; and making it difficult for consumers to enter the sweepstakes without an order.

8. Additionally, PCH has sent millions of emails that reference fictitious forms and documents beginning with a "W" followed by a hyphen and number or a "W" followed by a number, the same naming convention that the Internal Revenue Service uses on federal tax forms such as a W-2 (Wage and Tax Earnings Form) or W2-G (Certain Gambling Winnings Form), to trick consumers into opening and reading the emails. These fabricated forms and documents feature prominently in the subject lines of countless PCH emails but when consumers open the

emails, the body of the emails contains no further reference to any such forms or documents. Such subject lines are deceptive and serve as a device to provoke consumers to open emails and view PCH marketing materials.

9.      PCH also conceals the total cost of orders until after the consumer has incurred a financial obligation to PCH.  PCH's undisclosed shipping and handling charges amount, on average, to 41% of the costs of the merchandise ordered.

10.     PCH falsely represents that ordering is "risk free" when, in fact, consumers who want to return merchandise to PCH must do so at their own expense.

11.     Finally, until approximately January 2019, when the Company learned that the FTC was investigating its privacy practices, PCH's formal privacy policy falsely stated that PCH did not sell or rent consumer data.

12.     The above-referenced conduct constitutes multiple violations of the FTC Act and the CAN-SPAM Act, as detailed further herein.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

15.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also

enforces the CAN-SPAM Act, 15 U.S.C. §§ 7701-7713, as if a statutory violation of the CAN-SPAM Act "were an unfair or deceptive act or practice proscribed under Section 18(a)(1)(B) of the [FTC Act] (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 7706(a).

## DEFENDANT

16.     Defendant Publishers Clearing House LLC, also doing business as Liquid Wireless, Liquid, and PCH Media, is a New York limited liability company with its principal place of business at 300 Jericho Quadrangle in Jericho, New York, 11753. PCH transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, PCH has advertised and marketed sweepstakes entry opportunities to consumers throughout the United States.

## COMMERCE

17.     At all times relevant to this Complaint, PCH has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## PCH'S BUSINESS ACTIVITIES

18.     PCH was founded in 1953 in Port Washington, New York as a seller of discounted magazine subscriptions. In 1967, PCH initiated a series of sweepstakes promotions that marketed its magazine offerings. In 1985, PCH expanded into merchandise offerings, which now account for the majority of its sales.

19.     Since at least 1967, PCH has advertised its sweepstakes promotions to consumers throughout the United States and Canada via direct mail, radio advertisements, television commercials, digital advertising, and social media.

20.     Once known for its prolific direct mail advertising program, PCH now has a substantial online sweepstakes advertising program as well.  According to PCH, PCH.com attracts roughly 40 million unique visitors each month.

21.     PCH generates revenue of approximately $1 billion in product sales per year.

## PCH'S HISTORY OF DECEPTIVE PRACTICES

22.     Since the early 1990s, PCH has defended against numerous public and private lawsuits related to its business practices.  Additionally, PCH's sweepstakes marketing practices have been the subject of frequent criticism and scrutiny from Congress, federal and state regulators, consumer advocates, and the press.

23.     In 1992, fourteen states sued PCH for misleading people into believing that they could increase their odds of winning a sweepstakes by purchasing items from PCH and that they were sweepstakes finalists.  In 1994, PCH settled with the states for $490,000.

24.     In 1998, a congressional committee held a series of hearings about deceptive mailings and sweepstakes promotions.  *See* S. Rep. No. 106-102, at 1-5 (1999).  Senator Susan Collins' opening statement at the hearings explained that: "these hearings will explore whether . . . 'Government look-alike' mailings, and the combination of large headlines and small disclaimers are unfair practices that deceive consumers into making excessive, unneeded purchases."  Deceptive Mailings and Sweepstakes Promotions:  Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Governmental Affairs, 106th Cong., S. Hrg. 106-71, at 2 (Mar. 8-9, 1999).  She continued: "Time and time again, family members . . . have described sweepstakes companies bombarding elderly relatives with repeated mailings, each one giving the false impression that purchases will bring the consumer closer to winning the grand

prize." *Id.*

25.    The 1999 Committee Report noted that: "[w]hile most sweepstakes are legitimate . . . marketing devices, some of these promotions can be used to defraud and deceive consumers." S. Rep. No. 106-102, at 3-4. The report singled out "[f]our major sweepstakes firms[,]" including PCH, for which "there is evidence that a significant number of individuals make excessive purchases in response to these mailings." *Id.* at 14.

26.    During the hearings, elderly sweepstakes contestants and their children described how they and their family members routinely "believed that purchases increased their chances of winning." *Id.* "Evidence at the hearing showed that some consumers had spent tens of thousands of dollars, depleted savings, and had been forced to seek employment after entering retirement." *Id.* State attorneys general and AARP officials testified that some direct mail companies used "misleading and confusing marketing tactics, including small type, which is often overlooked by consumers with poor eyesight[,]" and used "mailers [that] mimic government documents" to deceive consumers. *Id.*

27.    One area of particular focus was PCH marketing materials that highlighted fictional conversations about individual consumers and their prospects of winning the sweepstakes. The Company was repeatedly asked about a sweepstakes mailing sent to nine million people that quoted one such purported conversation between PCH personnel. In this conversation, PCH staff appeared to be singling out the recipients of these mailers by name for favorable treatment in connection with winning a sweepstakes. *Id.* The Company's representative defended the Company's practice, claiming that the quoted conversations were "dramatizations" and that "consumers understand dramatizations." *Id.* Senator Carl Levin

rejected that characterization, stating "[t]hat conversation, you acknowledge, did not take place. Therefore, you told a customer that a specific conversation regarding him occurred which did not occur. You testified … that, in your judgment that that letter is perfectly fine. That letter is perfectly a lie. It is perfectly false. It is perfectly misleading. It is perfectly deceptive." *Id.*

28.     Moreover, Senator Collins questioned PCH's representative at length about several other matters, including "language [that] implies a connection between ordering and winning" in sweepstakes mailers. *Id.* Senator Arlen Specter noted that PCH's "practices . . . are conclusively deceptive on their face, beyond any question" and said, " I would ask you to . . . see if your firm wouldn't be doing something to clear up the record without waiting for legislation . . . I know you are trying to defend your company here, but your answers are really very, very defensive, and don't really ring accurately, at least in my judgment." *Id.* While questioning the Company, Senator John Edwards noted that: "it is clear, any normal person would look at these mailings . . . and their response would be that they are intended to fool people, to mislead them . . . we have to deal with this problem." *Id.*

29.     Following these hearings and subsequent legislative negotiations, President Clinton signed the Deceptive Mail Prevention and Enforcement Act ("DMPE Act"), 39 U.S.C. § 3001, into law on December 13, 1999. The DMPE Act mandates that sweepstakes mailers must clearly and conspicuously disclose "on the order or entry form, that no purchase is necessary to enter [the] sweepstakes[,]" and "that a purchase will not improve an individual's chances of winning" a sweepstakes. 39 U.S.C. § 3001(k)(3)(A)(ii). The DMPE Act also strengthened protections around deception related to government look-alike documents sent via mail. *See id.* § 3001(h)(1) (barring "solicitation by a nongovernmental entity . . . which could reasonably be

interpreted or construed as implying any Federal Government connection[.]").

30.     As the congressional inquiry and legislative process that resulted in the DMPE Act unfolded, PCH launched its first website.  Although the Company continues to send direct mailers, its online presence has increased dramatically since 1999.

31.     In the same year, PCH resolved a nationwide class-action lawsuit related to its deceptive marketing practices.  *See Vollmer v. Publishers Clearing House*, No. 99-cv-434 (S.D. Ill.).  The plaintiffs alleged that PCH duped consumers into believing that purchasing items from PCH would increase their chances of winning cash or other prizes.  *See* Second Amended Class Action Compl., *Vollmer v. Publishers Clearing House*, No. 99-cv-434 (S.D. Ill. June 21, 1999), ECF No. 4 at 1-4.  PCH reached a $10 million settlement with the class less than three months after the filing of the complaint.  *See* Order Approving Settlement, *Vollmer v. Publishers Clearing House*, No. 99-cv-434 (S.D. Ill. Aug. 3, 1999), ECF No. 32 at 1-5.  The Company pledged to revise its business practices to ensure that consumers understood its promotions and, in particular, that ordering is not necessary to win a sweepstakes prize.  *Id.* at 10.

32.     In 2000, 23 states sued PCH for sending mailers that misled consumers into believing that they were close to winning a prize and that ordering magazines and other merchandise would increase their odds of winning.  The Company reached a settlement in which PCH agreed to pay over $18 million, including over $15 million in restitution to consumers.

33.     In 2001, 26 states sued PCH for sending mailers that misled consumers into believing they were close to winning a prize and that ordering magazines and other merchandise would increase their odds of winning, allegations that were nearly identical to the lawsuit from the prior year.  The allegations resulted in a second settlement that required PCH to pay $34

million, including $1 million in civil penalties, and to apologize for the injury it caused consumers.

34.    The 2001 consent decree between PCH and 26 states included provisions like the following:

- "PCH shall not Represent that a purchase is necessary to enter or win a Sweepstakes or that ordering improves the Recipient's likelihood of winning." Consent Judgment, *Colorado v. Publishers Clearing House*, No. 00-CV-326 (Aug. 1, 2001).

- "PCH shall not Represent that a Recipient's failure to respond to a communication will or may result in the forfeiture or other loss of any previous valid entry or loss of any Prize to which the Recipient is or may be entitled, or Misrepresent that failure to timely return an entry will or may result in a loss of opportunity to enter the same Sweepstakes by response to another mailing or by an alternative method of entry." *Id.* at 16.

- PCH shall "at a minimum, Clearly and Conspicuously disclose in all Sweepstakes Communications including opportunities to enter and Order messages to the effect that no purchase is necessary to enter and that a purchase will not improve a person's chances of winning. …" *Id.* at 21.

- PCH shall not use "any term that Misrepresents that the Recipient has an enhanced status or position within a Sweepstakes superior to other timely entrants to describe any such status or position." *Id.* at 10.

- "PCH shall not Misrepresent . . . the deadline for any entry or action regarding an entry in a sweepstakes or the need for promptness in responding to an offer of a sweepstakes entry opportunity." *Id.* at 25.

35.    In 2010, 33 states and the District of Columbia filed another lawsuit, arguing that PCH's allegedly deceptive marketing practices and false promises of sweepstakes winnings violated prior consent judgments. PCH agreed to resolve this action by paying $3.5 million and entering into additional consent judgments that included an expanded list of prohibited marketing practices and affirmative obligations.

36.     In a supplemental consent judgment with the 26 settling states from the 2001 multistate action, PCH agreed to several provisions related to so-called "Order-Entry" forms, or forms that allowed consumers to both order a product and enter the sweepstakes, requiring PCH to clearly divide the provisions relating to ordering and entering, and to exclude any order-related information from the entry section.

37.     In 2013, the United States Senate Special Committee on Aging conducted an analysis of PCH's sweepstakes marketing practices online, which culminated in a 259-page report, *Pushing the Envelope: Publishers Clearing House in the New Era of Direct Marketing*, S. Rep. No. 113-153 (2014) ("Special Committee Report"), highlighting "ways in which it appears PCH may be communicating in a manner prohibited by the Deceptive Mail Prevention and Enforcement Act and/or the agreements with state Attorneys General." Special Committee Report at 4. By this time, PCH's "online program [was] … many times larger than offline in terms of outgoing solicitations." *Id.* at 3.

38.     Unlike the prior congressional inquiry into sweepstakes promotions as a general matter, this inquiry focused specifically on PCH's marketing practices, whether PCH was violating the DMPE Act, and whether PCH was violating any of its consent decrees with the states.

39.     The Special Committee Report drew attention to numerous online pop-up messages that consumers who wished to enter a PCH sweepstakes saw at the time, such as: "Order History Review: No Order Ever Placed" and "WAIT! We See That You ARE NOT PLACING AN ORDER!" *Id.* at 11. The report concluded by expressing concern that such representations may mislead or confuse a consumer about the relationship between purchasing

and winning a prize. *Id.* at 24.

40.     The Special Committee Report also noted that, despite provisions in the state

Consent Decrees, PCH communications "contain[ed] messages that may mislead reasonable

consumers into believing that their previous, valid entries [were] at risk of forfeiture if the

consumers [did] not respond to additional PCH solicitations." *Id.* at 5.

41.     Despite this extensive history of law enforcement actions, litigation, and scrutiny

from Congress, PCH continues to employ many of the very same techniques and messaging that

it has used for decades to deceive consumers into believing that there is a relationship between

ordering a product and entering or winning a PCH sweepstakes. PCH reinforces this deception

by driving consumers to its e-commerce website through email solicitations referencing

fictitious, official-sounding documents and threats that failure to respond to such solicitations

will result in a loss of eligibility to win a sweepstakes.

## PCH'S EMAILS AND E-COMMERCE WEBSITE

### PCH's Official Entry Registration Form

42.     When consumers visit PCH.com, PCH displays an "Official Entry Form" or

"Official Entry Registration Form" (collectively "Official Entry Form"), examples of which are

shown in Figures 1 and 2, below:

Figure 1: "Official Entry Registration Form" captured on January 13, 2020.



Figure 2: "Official Entry Form" captured on July 21, 2021.

43.     In numerous instances, the screen prominently states: "It's Free – Enter Now!" The page then typically states: "Complete this Official Entry Registration Form by the deadline posted in the Official Rules and submit below" or "Complete this Official Entry Form then click the WIN IT button below to continue!"

44.     After the consumer completes the form, the consumer is presented with a call-to-action button that typically states "Submit Entry!," "WIN IT!," or "Win for Life!," indicating that the consumer is entering the sweepstakes when they click on the button.

45.     In truth and in fact, PCH does not process consumers' sweepstakes entries when consumers complete and submit the "Official Entry Form." PCH falsely represents that consumers' sweepstakes entries will be submitted when they complete the "Official Entry Form"

and click on the call-to-action button.

46.     Instead, in numerous instances, when consumers click on the "Submit Entry!,"
"WIN IT!," or "Win for Life!" call-to-action button, PCH determines whether consumers are "e-
commerce qualified" based on an algorithmic model and any prior interaction consumers have
had with PCH.

47.     If consumers who click on the call-to-action button are not "e-commerce
qualified," PCH does not display e-commerce pages to those consumers.  Instead, PCH sends
them to webpages where consumers can play online games and/or view numerous third-party
advertisements prior to allowing consumers to enter the sweepstakes.

48.     If consumers are "e-commerce qualified," PCH directs them to its e-commerce
website path, where consumers must click through several shopping pages featuring products for
sale, including magazine subscriptions.  Between 60 and 70 percent of individuals who submit
their information on PCH's website for the first time are deemed "e-commerce qualified."

49.     After they scroll through pages of product advertisements, "e-commerce
qualified" consumers are presented with *another* call-to-action button that states "ENTER
NOW!"

50.     In numerous instances, when they click on the "ENTER NOW!" call-to-action
button, consumers must still scroll through magazine advertisements before PCH allows
consumers to enter the sweepstakes.  It is at this point where the consumer is *finally* entered into
the sweepstakes.



Figure 3: "Processing" Entry page captured on September 20, 2021.

51.     These individuals are subsequently sent through a recurring deceptive loop of emails and product advertisement webpages, all of which dangle the prospect of winning a sweepstakes as they prod consumers to purchase PCH products.

**Welcome Emails**

52.     Shortly after "e-commerce qualified" consumers complete the "Official Entry Form," go through several webpages of advertisements for products, and then submit a sweepstakes entry, PCH sends the consumer a "welcome" email.

53.     In numerous instances, the "welcome" emails lead consumers to a webpage that represents that, to be eligible to win the sweepstakes, consumers must complete an additional, "final" step.

54.     For example, between July 2018 and until at least September 2021, consumers who previously registered, entered the sweepstakes, and then clicked on the "welcome" email were shown the following webpage:



Figure 4: Sweepstakes Landing Page for Welcome Emails, PCH 459914.

55.     As shown in the image above, the "welcome" emails lead consumers to a landing page that indicates that the consumer must take a "final step" to complete all compliance requirements for full eligibility to win the sweepstakes.

56.     In truth and in fact, consumers who submitted a timely entry when they registered are fully eligible to win and do not need to complete another step to be eligible to win the sweepstakes.

17

57.     According to PCH's Official Rules, "[u]pon timely entry, your assigned Prize Number(s) will be fully eligible to win."

58.     The welcome emails, however, indicate that another step must be taken to be eligible to win the sweepstakes.

59.     Once consumers click on the "Act Now" call-to-action button on the webpage, they are taken through several shopping pages containing products for sale after which they are presented with another opportunity to enter the sweepstakes.  This is one example of how consumers enter PCH's online marketing loop, which creates an impression that product purchases are necessary to enter, or will increase one's chances of winning, a sweepstakes.

**PCH's Deceptive Loop**

60.     The deceptive loop is composed of emails and a series of webpages that prod consumers to buy PCH products. These webpage sequences are replete with references to entering the sweepstakes, references to the "rewards" and "benefits" of ordering PCH products, and language that conflates ordering a product with entering the sweepstakes.

61.     As described in greater detail below, the deceptive loop includes: (1) emails; (2) a sweepstakes landing webpage; (3) a product landing webpage; (4) a series of webpages featuring product advertisements; and (5) an "order-entry" webpage.

62.     In numerous cases, after consumers navigate through several pages of product advertisements, they reach the "Official Order-Entry Form" or "Official Entry-Order Form" (collectively "Official Order-Entry Form").  By calling this webpage an "Official Order-Entry Form," PCH explicitly conflates the processes of ordering a product and entering a sweepstakes—a conflation that is consistently reinforced throughout the deceptive loop.  The net

impression from PCH's design of its advertisements and website is that ordering a product and entering a sweepstakes are inextricably linked.

63.     In numerous instances, if consumers reach the "Official Order-Entry Form" without adding a product to their shopping cart, PCH displays a message directing the consumer back to the shopping pages.  In other cases, PCH initially hinders consumers from entering the sweepstakes after they click on the "Enter Now" button by making additional, urgent, and confusing product offers, which consumers must scroll through before reaching another "submit entry" call-to-action button.

64.     In numerous instances, consumers continue to engage with PCH's deceptive loop of emails, sequences of webpages that advertise its merchandise, and "Official Order-Entry Form(s)" due to the uncertainty created by the PCH emails that often indicate that the consumer must complete *another* step to be eligible to win the sweepstakes.

### Step One - Emails

65.     After consumers submit a sweepstakes entry and receive the "welcome" email, they start to receive a series of emails consistently over the course of approximately six to eight weeks that typically represent that they must complete a "final" or an additional step to secure a prize number on the "winner selection list" or be eligible to win the sweepstakes.  In some instances, the emails warn that if they do not act in response to the email, consumers will either forfeit their prize numbers or be disqualified from the opportunity to win the sweepstakes.

66.     For example, between December 2018 and June 2021, PCH sent all "e-commerce qualified" consumers who had already submitted at least one timely sweepstakes entry the following emails:

- It's waiting for you – a Prize Number on the Winner Selection List! Don't let it be forfeited. Act Now to Claim a Prize Number That's Already On the Winner Selection List. This is important: Failure to Enter will result in your forthcoming number being forfeited, never to become fully eligible for you to win a $25,000.00 a month for life… Winner Selection List: The official list of all timely entries eligible to be selected a prize number on 6/30. Only people with numbers on the winner selection list can win.

- Final Step Pending re: $5,000.00 a week "Forever" Prize Number Transfer . . . Immediate Action Requested . . . Important: [Consumer's Name], your record shows that ONE FINAL STEP REMAINS here for you to secure a prize number on the Winner Selection List – the one and only list from which our $5,000.00 a week "forever" prize winner will be selected, in the last of a series of drawings for [Giveaway] No. 11000.

- Official Proof of Completion . . . Great News! There's One Final Step left here! . . . You see, all prize numbers must go through specific steps before they can be in a position eligible to win a prize. From deciding which recipients will receive a notice to the timely return of an entry, these steps cover important processes before we select a winner . . . Our file shows 2 out of 3 steps successfully completed . . .

- Authorized Advisory . . . Winning Number Verification Scheduled Immediately after selection of winning number on Tuesday, Feb. 26th . . . Respond by Entering immediately. Just 1 Step Left WNV – 52 Notice . . . BE

ADVISED THAT failure to follow entry instructions enclosed will automatically preclude you from any opportunity to be verified as the $5,000.00 a week "forever" winner with our forthcoming prize number.

- . . . Your decision is requested immediately! . . . **CERTIFICATE OF TITLE** REGARDING FORTHCOMING PRIZE NUMBER . . . IMPORTANT – TITLE ENCLOSED . . . **OFFICIAL PRIZE COMMUNICATION** . . . Please examine the enclosed Certificate of Title issued for [Consumer's Name].  Your Title is proof that the Prize Number to be issued to [Consumer's Name] upon timely response will be LOCKED, along with all other eligible numbers . . . the ONLY place from which the winning number for our Lifetime Prize will be selected.

- … Act now to avoid cancellation of this prize opportunity… IMPORTANT NOTICE… [Consumer's Name]: Timely respond to avoid cancellation RE: $5,000.00 a week for life prize opportunity herein… [Consumer's Name]: we have attempted to contact you multiple times, and you haven't responded to any of our notices… If you still do want to win… it's so important you respond here…  Avoid Cancellation…

67.     Between January 2019 and June 2020, PCH sent all "e-commerce qualified" consumers who had already submitted at least one timely sweepstakes entry the following emails:

- As of now, your Contest File is "incomplete".  Fix this with 1 simple STEP!...CONTEST FILE: INCOMPLETE… ONE CRITICAL STEP,

[consumer's name]: By completing your contest file for this notice and claiming your personal number, you will have met ALL eligibility requirements for this chance to win $7,000.00 A Week For Life… But, [consumer's first name], there's one open issue – as of now, your Contest Eligibility File is "incomplete", which will automatically prevent you from having any chance of winning… The choice is yours, but just know, others have made the mistake of leaving their Contest File "incomplete" and ultimately forfeited all rights to prize number…

- … avoid disqualification of your forthcoming "forever" prize number! Winner Selection Disqualification Notice.  Final & Only Call! Disqualification Warning… [Consumer's name], if your claim to the forthcoming Prize Number is received after the entry deadline indicated in the <u>Official Rule</u> passes, said Number will be disqualified.  It will not be added to the Winner Selection List for you and you cannot win… Your "Forever" Prize Number is in danger of DISQUALIFICATION! … Provided you respond as directed, the Prize Number to be assigned solely to you will be added to the Winner Selection List… It is extremely important that your Prize Number does not end up on the List of Disqualified Numbers.

68.     In truth and in fact, a consumer does not need to take a "final" or "additional" step to claim a prize number on the "winner selection list" or be eligible to win the sweepstakes if they have already submitted a timely entry.  As previously stated in Paragraph 57, PCH's Official Rules state that all timely entries are fully eligible to win the sweepstakes.

69.     The links in PCH's emails generally do not send consumers to a true "final" step of some kind but directly to its e-commerce website.  In numerous instances, PCH's emails include no "disclosure" at all, that a purchase is not necessary to enter the sweepstakes or that a purchase does not increase the chances of winning the sweepstakes.  Nor does PCH otherwise attempt to correct for the misleading nature of the emails.

### *Steps Two & Three - Sweepstakes Landing Page and Product Landing Page*

70.     When consumers click, for example, the "Act Now" or "Complete Final Step" button ("call-to-action button") in these emails, PCH takes them to a webpage that PCH refers to as the "sweepstakes landing page."

71.     The "sweepstakes landing page" contains instructions regarding the sweepstakes. It often instructs consumers to "continue" on to enter the sweepstakes.

72.     PCH then leads consumers from the "sweepstakes landing page" to a webpage that PCH refers to as the "product landing page," which contains instructions to order merchandise.  The product landing webpage typically states that "one order is all it takes" or refers to the consumer's "order status."

73.     In numerous instances, PCH uses images and design elements such as arrows that point from the sweepstakes landing page to the product landing page, that imply that entering the sweepstakes is associated with ordering merchandise.

74.     For example, PCH showed consumers the following sweepstakes landing and product landing pages that link entering the sweepstakes and ordering products between December 2018 and June 2021:

- Example One of Sweepstakes Landing Page to Product Landing Page:





Figure 5: Sweepstakes Landing Page and Product Landing Page for Critical Decision Required Email Campaign, PCH 459851 –52.

- Example Two of a Sweepstakes Landing Page pointing to the Product Landing Page:





Figure 6: Sweepstakes Landing Page and Product Landing Page for Winning Number Verification Refresh Email Campaign, PCH 459709 – 10.

- Example Three of Sweepstakes Landing Page pointing to the Product Landing Page:



Figure 7: Sweepstakes Landing Page and Product Landing Page for Proof of Completion Email Campaign, PCH 459696 – 97.

***Step Four – Merchandise Pages***

75.　After directing consumers from the Sweepstakes Landing Page to the Product Landing Page, and instead of immediately allowing the consumers to enter the sweepstakes, PCH leads consumers through several webpages of advertisements for products.

76.　In numerous cases, consumers who have not added merchandise to their cart while clicking through the pages of advertisements are bombarded with pop-up messages alerting consumers that they have not placed an order and/or conflating ordering with entering.



Figure 8:  Lightbox pop-up captured on July 30, 2018.

***Step Five – Order-Entry Form***

77.　Until 2020, PCH presented consumers with an "Official Order-Entry Form" after scrolling through several pages of advertisements.  These pages presented consumers with the option to "submit entry and order" or "submit entry," depending on whether they had any items in their carts.  As described in Paragraphs 114-123, below, after PCH introduced a checkout

process that included a credit card payment option, they presented consumers with the option to "submit an order and continue" if they had items in their shopping cart.

78.    In numerous cases, consumers who click on the call-to-action button to enter the sweepstakes without any items in their carts are not immediately entered into the sweepstakes. Instead, a message appears on the screen notifying them that "YOUR CART'S STILL EMPTY" along with another screen of product advertisements.



Figure 9: "EO Form" lightbox for Cancellation Notice Email Campaign sent to consumers between January 2017 and December 2019, PCH 453816.

79.    If the consumer scrolls through additional pages of merchandise, in numerous instances, PCH presents the consumer with another Official Order-Entry Form.

80.    At the end of each long page of merchandise or magazine subscription offers,

PCH states in small, light-colored typeface the following: "No purchase or fee necessary to enter. A purchase won't increase an individual's chance of winning." This message appears in an area referred to as "below the frame" of the webpage, meaning that consumers must scroll down to see it, which they are unlikely to do. The message is also below the main "continue" button, which is prominently displayed in large font, an example of which is shown below:



Figure 10: "No purchase or fee necessary to enter. A purchase won't improve an individual's chance of winning" notice displayed underneath the "continue" button, captured on July 13, 2021.

81.     PCH includes the same message above the "submit entry and order" or "submit entry" button on the "Official Order-Entry Form."



Figure 11: Official Order-Entry Form, PCH 27531.

82.     While the message appears around the "submit entry" or "submit entry and order" button, it does not cure the deceptive net impression that a purchase is necessary to enter or that a purchase will increase one's chance of winning the sweepstakes because a consumer is not likely to see it. If a consumer happens to see the disclosure, the deceptive loop is designed, as shown below, to persuade them that they have not, in fact, submitted a valid sweepstakes entry unless

they purchase.

<strong><em>Back to Step One - Emails</em></strong>

83.     In numerous instances, PCH bombards consumers with emails soon after they go through the loop and enter the sweepstakes that indicate, once again, that the consumer must complete "one final step" or "one critical step," or that there is "just [one] step left," to claim a prize number on the winner selection list and be eligible to win the sweepstakes, or else be disqualified from the opportunity to win the sweepstakes.  These emails draw consumers back into the deceptive loop.

84.     In numerous instances, PCH purports to award consumers who purchase products some kind of special status on the product landing pages, which further reinforces to consumers the impression that ordering more products increases their chances of winning.

85.     Those who order are awarded "Preferred Customer," "Preferred Plus," or "Presidential Preferred Customer" status depending on how many orders they have placed with PCH.  An example of a product landing page that reveals different levels of status depending on the consumer's order history is as follows:



Figure 12:  Product Landing Page of Prize Coupons V2 Email Campaign, PCH 459838 (emphasis in original).

## Emails with Deceptive Subject Headings

86.     Since at least 2016, PCH has sent millions of emails with subject lines that referred to fictitious forms, documents, or actions to provoke consumers into opening and reading the emails.  These subject lines featured references to a "W" followed by a hyphen and a number or a "W" followed by a number.

87.     Examples of such subject lines include: "High Priority Doc. W-2 Issued"; "High Priority Doc. W-10 Enclosed"; "W-19 Notice – Step 3 of 3 INCOMPLETE"; "Enclosed Doc. W8 CERTIFIED.  OPEN NOW!"; and "CONFIRMED & BINDING Contents Re. Doc W11."

88.     These subject lines mislead recipients about a material fact regarding the contents or subject matter of the email message by conveying the sense that recipients urgently need to review an important document, fill out an official form, or otherwise act to comply with an official requirement.  Yet there are no such documents, forms, or other compliance requirements to be found in the body of these emails or on the PCH webpages to which these emails direct consumers.

89.     For example, between December 27, 2018 and February 25, 2019, PCH sent the email reproduced below to over 593,000 consumers.  The subject line of this email was: "High Priority Doc. W-52 Enclosed."  However, no "High Priority Document" or "Document W-52" actually existed, nor was any such document "enclosed" or even referenced in the body of the email.  Instead, the email instructed consumers to "Complete [a] Critical Step" to be eligible for the $5,000-a-week sweepstakes prize.




Figure 13: "High Priority Doc. W-52 Enclosed" Subject Line Email, PCH 458215 – 16.

90.     In another example, PCH sent the email reproduced below to over 738,000 consumers on May 3, 2019.  The subject line of this email was: "Enc. Doc. W30 APPROVED. OPEN NOW!"  However, no document "W30" actually existed, nor was any such document "enclosed" or even referenced in the body of the email.  Instead, the email, titled a "Winner Selection List Commitment," touted a prize of "$50,000 A Month For Life," and "urged" consumers to "Respond Now" or "Act Now" "before [their] number [was] permanently forfeited!"

 

Figure 14: "Enc. Doc. W30 APPROVED.  OPEN NOW!" Subject Line Email, PCH 459440-43.

91.     These subject lines were likely to mislead consumers about a material fact regarding the contents or subject matter of the emails because such forms were a complete fiction.

92.     Much like the examples above, in numerous instances, not only was the document or form mentioned in the subject line of the email a sham, but the body of the emails contained no further reference to any such documents, forms, or other supposedly pressing requirements.

93.     The inclusion of "W-#" language in these subject lines compounds the deception inherent in referring to fabricated documents or forms to induce consumers to open emails and

view PCH marketing materials.

94.     Numerous forms used by the Internal Revenue Service ("IRS") employ the same naming convention that PCH uses in its deceptive subject lines:  a capital W followed by a hyphen and a number.  For example, IRS Form W-2 is a widely known wage and tax statement form.  There are many other IRS "W-#" forms that taxpayers receive or must complete to comply with federal income tax laws.

95.     The use of the same or similar naming convention that the IRS uses on federal tax forms paired with a forceful demand that consumers comply with some pressing requirement when no such requirement exists increases the likelihood that consumers will be misled by these subject lines.  Subject lines such as "High Priority Doc. W-34 Issued" create the impression that consumers have a tax form, tax obligation, or tax-related requirement that they must fulfill.

96.     Even if consumers do not believe they have a tax obligation when they see these subject lines, the use of a letter and a number in association with a form or a document misleadingly suggests that there is a definite and official requirement to which a consumer must attend.  For example, the inclusion of "W-#" language in the subject line "W-19 Notice – Step 3 of 3 INCOMPLETE" lends specificity and formality to PCH's appeal.

97.     For these reasons, the use of "W-#" language exacerbates the deception inherent in tricking consumers with urgent solicitations to review forms and documents that do not exist.

98.     Finally, PCH has actual knowledge, or knowledge can be fairly imputed to it under the circumstances, that these subject lines are likely to mislead a recipient.  Despite frequently blasting emails to hundreds of thousands of consumers touting fictional forms and documents, PCH knows that no such forms and documents actually exist and that promoting

illusory forms and documents is likely to mislead consumers.

99.     PCH has come under repeated fire by Congress, federal and state regulators, and consumer advocates for its deceptive use of government lookalike forms in connection with its sweepstakes promotions.  Given this extensive history of public criticism for referencing or using bogus government forms, PCH knows, or knowledge can be fairly imputed to it, that using a well-known naming convention that is uniquely associated with IRS forms in the subject lines of its emails is likely to mislead its customers.

100.    Numerous consumers clicked on the violative emails. In many cases, consumers who clicked on ecommerce emails proceeded to place orders. Even those consumers who visited the ecommerce website and did not place orders spent valuable time on the website. In addition, numerous consumers who clicked on emails that led them to other websites operated by PCH spent valuable time on those other websites.

**Consumers' Order and Checkout Experience**

***Prior to August 2019***

101.    Until approximately August 2019, PCH did not offer consumers the option to pay for merchandise when they placed an order.  Consumers would instead receive an invoice along with the merchandise in the mail.

102.    When consumers added an item to their cart while scrolling through the merchandise pages, the item would first appear in the cart at the bottom of the merchandise page.

103.    After consumers scrolled and clicked through the merchandise pages, they reached a combined "Official Order-Entry Form" page, which displayed consumers' shopping carts.  The shopping carts displayed the "PCH Price," which was the price of the product, and the

amount of each installment payment if the consumer chose to pay in installments.

104.    The shopping carts did not display a statement of total costs, including shipping and handling charges or applicable taxes.  An example of PCH's shopping cart, which displayed the "PCH Price" and installment payment, is below:



Figure 15:  Order Page captured on July 30, 2018.

105.    Under the shopping cart, PCH added the following small-print disclosure: "*For Merchandise Offers, see details on applicable sales tax, shipping and handling, and other charges by clicking here."  Only those consumers who clicked on the link would see a table of shipping and handling costs based on order value.

106.    Although consumers did not enter payment information at the time they submitted the order, PCH's position has been that they assumed the obligation to pay for any merchandise at the time they placed the order, and in fact, were being extended "free credit."  In numerous cases, consumers were unaware that they had assumed such an obligation by clicking on the "Submit Your Entry & Order" button.

107.    Shortly after consumers clicked on this button, PCH would send them "order confirmation" emails with the "order details." The "details" in the order confirmation email did not include the total costs of the consumers' orders nor did they mention or set forth any shipping and handling charges or taxes associated with the order.

108.    Several days later, PCH sent consumers "order processed" emails, which contained the price of the merchandise, shipping and handling charges, and applicable taxes. This email was the first communication that consumers received from PCH that contained a statement of the total costs to be paid by the consumer.

109.    In addition to displaying the total costs of the order for the first time, the "order processed" emails also notified consumers that the order "has been Processed and is being scheduled for shipment." The "order processed" emails did not include any information on how to cancel the order.

110.    PCH's policy on order cancellations, which is found in the "Frequently Asked Questions" page of the Company's website, states as follows:

> Due to our automated processing system[,] there is a very limited window in which we are able to cancel your merchandise order. We process orders very quickly and, like many other companies, once an order enters our fulfillment process we are unable to cancel it and stop the shipment.

111.    In numerous cases, by the time consumers received the "order processed" email that included the total costs of their order, it was too late for them to cancel and stop shipment of their order.

112.    In such cases, consumers had to wait until after they received the merchandise in order to return the product. In numerous instances, consumers were required to pay the shipping

costs associated with returning their merchandise.

113.    Numerous consumers have complained that PCH never disclosed the shipping and handling costs when they placed the order.  They were surprised to learn of the high shipping and handling costs when they read the order processed email or received the products in the mail.

### *August 2019 to the Present*

114.    Beginning in approximately August 2019, PCH introduced a new checkout process.

115.    As shown below, in some cases, the consumer would be presented with an Order-Entry form that was similar to that depicted in Figure 15, above, except that the call-to-action button would state "PLACE ORDER & continue" and make no reference to submitting an entry:



Figure 16:  Image contained in "Marketing Update June 2020," PCH 229672.

116.    PCH then inserted a checkout "option page" after consumers had submitted an order, which invited consumers to choose either to (1) pay by credit card; or (2) pay or be billed later.  An example of such an option page is below:



Figure 17:  Image contained in "Marketing Update 2020," PCH 229670.

117.    Consumers who chose the "pay later" option would not be provided with a statement of total costs, including shipping and handling and applicable taxes, until they received an "order processed" email, at which point, consistent with PCH's policy as stated in Paragraph 110, above, it was generally too late to cancel an order and stop shipment.

118.    If consumers opted instead to "pay now" by credit card, they would be led to a payment page, which included a summary of total costs, including shipping and handling charges and applicable taxes.

119.    PCH's own records reveal that their shipping and handling charges average 41% of the costs of the merchandise and could be as high as or higher than 100% of the merchandise costs.  Numerous PCH executives and employees, including a Senior Vice President, Assistant Vice President, the Associate Director of the E-commerce, and Senior Director of Creative, have acknowledged that consumers experience "sticker shock" when they see shipping and handling charges.

120.    In fact, PCH's records show that approximately 50% of consumers who initially selected the pay by credit card option ultimately declined to enter their credit card information after seeing the shipping and handling charges associated with their orders, a fall-off that was

widely ascribed by PCH management to the disclosure of shipping and handling charges on the payment page.

121. PCH took various steps to mitigate the "sticker shock" of shipping and handling charges and the enduring issue of the 50% falloff in credit card payments. These measures included offering free shipping.

122. After PCH tested free shipping as a means of incentivizing credit card payments, the Company's Vice President and Chief Analytics Officer acknowledged in an email to other key executives that "there was a high sensitivity to shipping costs" among its consumers.

123. In early 2020, PCH designed a new credit card payment page. The new design, depicted in Figure 18, below, resulted from a deliberate effort to make information about shipping and handling and other costs less conspicuous. As PCH's Senior Director of the Creative Department explained in a June 1, 2020, email to executives, they had redesigned the payment page by "flush[ing] [the cost information] left instead of right, and us[ing] color to bring [the consumer's] eye down past [the cost section] to the actions [PCH wanted] them to take," that is, entering their credit card information.



Figure 18: PCH 164522.

## PCH's "Risk-Free" Guarantee

124.    PCH repeatedly promises consumers that ordering is "risk free."  Examples of PCH's "risk-free" guarantees are shown below:



Figure 19:  PCH 304075, PCH 448244.

125.    PCH's risk-free guarantee is false and misleading.  PCH's policy is that

consumers must bear the burden of returning merchandise at their own expense.

126.    No mention of the consumer's obligation to return merchandise at their own

expense, or PCH's policy not to reimburse consumers for return postage, appears on PCH's e-

commerce webpages or Order-Entry page.

127.    PCH's policy about returning merchandise is, in fact, only located in the

Frequently Asked Questions section of the Company's website in a section entitled: "How do I

return my Publishers Clearing House order?"

128.    If consumers proactively visit this page and click on the question, they are led to a lengthy statement that reiterates that ordering from PCH is "Risk-Free." Yet at the end of the page, the Company reveals the following: "our company policy does not include reimbursement for postal expenses, which may be incurred with the return of merchandise to our returns processing facility."

129.    In numerous cases, the costs of returning merchandise by USPS or other means are substantial in relation to the cost of the product.

130.    PCH's own records show that numerous consumers have requested that PCH provide pre-paid return shipping labels and have been dismayed to discover that PCH does not cover the cost of return postage.

## PCH's Deceptive Representation in its Privacy Policy

131.    Until on or about January 2019, PCH had conflicting representations in its privacy policy. It had a statement in the middle of its privacy policy stating it did "not rent, license, or sell" consumers' information to third parties

132.    Other sections of its privacy policy stated that it did share information with third parties in aggregate form. Indeed, PCH has shared consumers' personal information with third parties including marketing cooperatives, advertisers, and publishing companies to target advertisements on PCH consumers.

133.    On or about January 2019, PCH removed the statement that PCH "do[es] not rent, license, or sell personal data to third parties" from its privacy policy.

134. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

135. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

136. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

### Misrepresentation Regarding Sweepstakes Offers

137. In numerous instances, in connection with the advertising, marketing, or promotion of sweepstakes offers, Defendant has represented, directly or indirectly, expressly or by implication, that a purchase is necessary to enter the sweepstakes or that a purchase would increase one's chances of winning the sweepstakes.

138. In truth and in fact, in numerous instances in which Defendant has made the representation set forth in Paragraph 137, a purchase is not necessary to enter the sweepstakes and does not increase one's chances of winning the sweepstakes.

139. Therefore, Defendant's representation as set forth in Paragraph 137 is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

## Misrepresentation Regarding Entering the Sweepstakes

140.     In numerous instances, in connection with the advertising, marketing, or promotion of sweepstakes offers, Defendant has represented, directly or indirectly, expressly or by implication, that consumers who complete and submit the "Official Entry Form" or "Official Entry Registration Form" on PCH's website are in fact entering a sweepstakes at the time they submit the online form.

141.     In truth and in fact, in numerous instances in which Defendant has made the representation set forth in Paragraph 140, consumers are not entering a sweepstakes—and cannot submit a sweepstakes entry—at the time they submit the online form.

142.     Therefore, Defendant's representation as set forth in Paragraph 141 is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

## Deception Regarding Entering the Sweepstakes

143.     In numerous instances, in connection with the advertising, marketing, or promotion of sweepstakes offers, Defendant has represented, directly or indirectly, expressly or by implication, that consumers are completing the "Official Entry Form" or "Official Entry Registration Form" on PCH's website for the purpose of submitting an official sweepstakes entry.

144.     In numerous instances in which Defendant has made the representation set forth in Paragraph 143, Defendant has failed to disclose or disclose adequately to consumers that

PCH does not in fact enter consumers into the sweepstakes at the time they complete and submit the "Official Entry Form" or "Official Entry Registration Form" on PCH's website.

145.    In light of the representation described in Paragraph 143, Defendant's failure to disclose or disclose adequately the material information described in Paragraph 144 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV

### Misrepresentation Regarding Eligibility to Win Sweepstakes

146.    In numerous instances, in connection with the advertising, marketing, or promotion of sweepstakes offers, Defendant has represented, directly or indirectly, expressly or by implication, that consumers must complete another step even after they have previously entered the same sweepstakes:

- To remain eligible to win the sweepstakes;
- To claim a place on a list from which the winner of the sweepstakes will be selected; or
- To avoid disqualification, forfeiture, or cancellation of the opportunity to win the sweepstakes.

147.    In truth and in fact, in numerous instances in which Defendant has made the representations set forth in Paragraph 146, consumers who have previously submitted a timely sweepstakes entry do not need to take an additional step to remain eligible to win the sweepstakes, do not need to claim a place on a list from which the winner of the sweepstakes will be selected, and do not need to complete another step to avoid disqualification, forfeiture, or cancellation of the opportunity to win the sweepstakes.

148.     Therefore, the representations set forth in Paragraph 146 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count V

## Misrepresentation Regarding Total Costs of Orders

149.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of products, Defendant has represented, directly or indirectly, expressly or by implication, the total costs of an order to be those set forth on the order-entry page.

150.     In truth and in fact, in numerous instances in which Defendant has made the representation set forth in Paragraph 149, the total costs of an order are not set forth on the order-entry page, which does not include substantial shipping and handling fees, among other costs.

151.     Therefore, Defendant's representation as set forth in Paragraph 149 is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VI

## Deception Regarding Additional Charges Associated with Consumers' Orders

152.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of products, Defendant has represented, directly or indirectly, expressly or by implication, that the price of an order is as stated on the order-entry page.

153.     In numerous instances in which Defendant has made the representation set forth in Paragraph 152, Defendant has failed to disclose or disclose adequately before a consumer incurs a financial obligation, material costs associated with consumer orders including taxes and

substantial shipping and handling fees.

154.     In light of the representation described in Paragraph 152, Defendant's failure to disclose or disclose adequately the material information described in Paragraph 153 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VII

### Misrepresentation Regarding "Risk-Free" Order Guarantee

155.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendant's products, Defendant has represented, directly or indirectly, expressly or by implication, that ordering is risk free.

156.     In truth and in fact, in numerous instances in which Defendant has made the representation set forth in Paragraph 155 of this Complaint, ordering is not risk free, as consumers are required to pay substantial shipping costs to return products.

157.     Therefore, Defendant's representation as set forth in Paragraph 155 is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VIII

### Misrepresentation Regarding the Sharing of Consumers' Personal Information

158.     Until on or about January 2019, Defendant has represented, directly or indirectly, expressly or by implication, that it does "not rent, license, or sell personal data to third parties."

159.     In truth and in fact, before January 2019, Defendant did rent, license, or sell consumers' personal data to third parties including, but not limited to, other marketing and advertising partners and media intermediaries who used the information to target consumers with

third-party advertising on PCH's websites and other third-party platforms.

160.    Therefore, Defendant's representation set forth in Paragraph 159 is false and misleading and constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## <u>VIOLATION OF THE CAN-SPAM ACT</u>

161.    The CAN-SPAM Act, 15 U.S.C. § 7701 et seq., became effective on January 1, 2004, and has since remained in full force and effect.

162.    Section 3(2)(A) of the CAN-SPAM Act, 15 U.S.C. § 7702 (2)(a) states that "[t]he term 'commercial electronic mail message' means any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet website operated for a commercial purpose)."

163.    Section 3(5) of the CAN-SPAM Act, 15 U.S.C. § 7702 (5) states, in pertinent part, that "[t]he term 'electronic mail address' means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox … and a reference to an Internet domain,… whether or not displayed, to which an electronic mail message can be sent or delivered."

164.    Section 3(6) of the CAN-SPAM Act, 15 U.S.C. § 7702 (6), states that "[t]he term 'electronic mail message' means a message sent to a unique electronic mail address."

165.    Section 3(9) of the CAN-SPAM Act, 15 U.S.C. § 7702 (9), states, in pertinent part, that "[t]he term 'initiate,' when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message … ."

166. Section 3(13) of the CAN-SPAM Act, 15 U.S.C. § 7702 (13), states that "[t]he term 'protected computer' has the meaning given that term in section 1030 (e)(2)(B) of title 18. Section 1030 (e)(2)(B) of Title 18 states that: "[t]he term 'protected computer' means a computer … which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030 (e)(2)(B).

167. Section 5(a)(2) of the CAN-SPAM Act, 15 U.S.C. § 7704 (a)(2), states:

It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message if such person has actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that a subject heading of the of the message would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message (consistent with the criteria used in enforcement of section 45 of this title).

168. Section 7(e) of the CAN-SPAM Act, 15 U.S.C. § 7706 (e), states that in any action to enforce compliance through an injunction with Section 5 (a)(2) and other specified sections of CAN-SPAM, the FTC need not allege or prove the state of mind required by such sections.

169. Section 7 (a) of the CAN-SPAM Act, 15 U.S.C. § 7706 (a), states:

[T]his chapter shall be enforced by the [FTC] as if the violation of this chapter were an unfair or deceptive act or practice proscribe under section 18(a)(1)(B) of the [FTC Act] (15 U.S.C. § 57a(a)(1)(B)).

**Count IX**

**Misleading Subject Headings**

170.    In numerous instances, as described in Paragraphs 86-100, Defendant initiated the transmission, to protected computers, of commercial email messages that contained subject headings that would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

171.    Defendant's acts or practices, as described in Paragraph 170, violate Section 5(a)(2) of the CAN-SPAM Act, 15 U.S.C. § 7704(a)(2).

## CONSUMER INJURY

172.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the CAN-SPAM Act.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and the CAN-SPAM Act by Defendant.

B.    Award monetary relief against PCH and in favor of Plaintiff for violations of the CAN-SPAM Act.

C.    Award such relief as the Court finds necessary including rescission or reformation of contracts, the refund of money, or other relief necessary to redress injury to consumers.

D.    Award other relief within the Court's power to grant.

E.    Award any additional relief as the Court determines to be just and proper.

Dated: 6/26/23

Respectfully submitted.

SAVVAS S. DIACOSAVVAS
FEDERAL TRADE COMMISSION
Northeast Region
One Bowling Green. Suite 318
New York, NY 10004
Tel.: 212-607-2809
Fax: 212-607-2822
Email: sdiacosavvas@ftc.gov

MIRY KIM
ELSIE B. KAPPLER
JOSH DOAN
FEDERAL TRADE COMMISSION
Division of Marketing Practices
Bureau of Consumer Protection
600 Pennsylvania Ave., N.W., CC-6316
Washington, DC 20580
Tel.: 202.326.3622 (MK)
Tel.: 202.326.2466 (EBK)
Tel.: 202.326.3187 (JD)
Fax: 202.326.3395
Email: mkim@ftc.gov
Email: ekappler@ftc.gov
Email: jdoan@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION